[L. A. No. 15308.   In Bank.—March 29, 1937.]

CORONA FOOTHILL LEMON COMPANY (a Corporation) et al., Plaintiffs; WILLIAM FISHER et al., Respondents, v. CHARLES E. LILLIBRIDGE et al., Appellants.

W. G. Irving, Rutan & Mize, Head, Wellington & Jacobs and Barker & Keithly for Appellants.

C. L. McFarland, Fred L. Hamlin, Charles D. Swanner, and Eugene Best, *Amici Curiae* on Behalf of Appellants.

Walter S. Clayson, Scarborough & Bowen and Guy Richards Crump for Respondents.

EDMONDS, J.—The controversy presented by this case concerns the right to underground waters.

The respondents are owners of lands overlying what they claim to be the Corona basin. The appellants, it is charged in the complaint, about the month of July, 1930, began pumping water in large quantities from wells situated on their lands also in the basin, which water they transported through an open ditch into the Santa Ana River and finally to points outside of the basin; that during the summer and fall of 1930 appellants so exported from the basin more than 500 miner's inches of water per day (the term "miner's inch" being used to specify 1/50th of a cubic foot of water per second), and sold such water for use on lands in Orange County, more than ten miles from the basin; that between October, 1930, and March, 1931, appellants bored additional wells and enlarged their pumping plants and facilities for the purpose of increas-

ing their exportation of water; and that about April 1, 1931, they resumed their exportation activities and transported from the basin large quantities of water, allegedly in excess of 800 miner's inches, continuous flow. It is also alleged that appellants' pumping operations and exportation of water have depleted the water in the basin, and that a continuance of these acts will exhaust it, to the respondents' irreparable loss and injury.

Appellants Lillibridge and Anaheim Sugar Company filed separate, similar answers denying the material allegations of the complaint and setting up separate defenses. They admitted exportation of water, but specifically denied that their activities had or would in the future injure the respondents or lower the water plane under the respondents' lands. Their main defense, which is also their major contention on appeal, is that there is no such physical or hydrological structure as the twenty-five square mile Corona underground water basin described in the complaint. They allege that the sole underground water basin existing within the exterior limits of the twenty-five square miles referred to as the Corona area is a smaller area or underground reservoir known as Temescal wash or Temescal underground reservoir, having a superficial area of about 4.7 square miles (specifically described), over which lie their lands and the lands of some, but not all, of the respondents. The pleadings thus placed sharply in issue the existence and extent of the underground reservoir in the Corona area, the alleged injurious effect of appellants' activities, and the rights of the parties with respect thereto.

On issues so joined the cause went to trial. By stipulation during the trial the plaintiffs Corona Foothill Lemon Company, Quilici, and Kirkley were permitted to withdraw and the complaint as to their claims was dismissed. At the close of the trial the court made findings in favor of the remaining plaintiffs, in substance upholding the allegations of their complaint. The court found that Corona basin exists with exterior boundaries as alleged by the respondents; that it has a natural water supply, with water therein everywhere in contact, constituting a natural underground reservoir. It found that the natural supply in the basin does not amount to as much as the annual supply required and now put to a reasonable and beneficial use on lands overlying the basin, but that the natural supply has been augmented for many years

by water imported into the basin by Temescal Water Company; that even with such additional imported water spread upon lands in the basin there is no surplus of water therein and not more than the amount necessarily required for domestic uses and irrigation of overlying lands. It found that appellants' pumping and exportation operations had been conducted substantially as alleged and that these activities had materially lowered the water plane in Corona basin and in the respective wells of respondents and were depleting and would ultimately exhaust the water therein, to the respondents' irreparable loss and injury.

The judgment upon these findings decreed that appellants and respondents "have equal and correlative rights in, and are entitled to take water from, said body of underground percolating water within said Corona basin for reasonable and beneficial uses upon lands overlying said basin and entitled thereto"; that the present uses of water by the parties on overlying lands are reasonable and beneficial but that respondents' rights are paramount to the rights of appellants to export water, which exportation has caused and will continue to cause the respondents irreparable loss and injury. By the judgment the appellants are permanently restrained and enjoined from withdrawing water for any purpose other than reasonable and beneficial uses on overlying lands. The appeal is from this judgment.

The city of Corona is, and for many years has been, the center of one of the principal citrus developments in the state of California. It is situated in the northwesterly part of Riverside County, in the lower Temescal Valley. The water supply for this area is obtained from wells sunk in the valley and from water imported from other sources by the Temescal Water Company. The gravamen of respondents' complaint is that, as overlying landowners, they have the paramount right to all water which naturally finds its way into the basin which they contend exists in the lower Temescal Valley. They assert that there has been a gradual lowering of the water plane over a period of many years, which has persisted despite a substantial artificial addition to the supply from foreign sources, and that the effect of the continued exportation of water by appellants will be to deplete and exhaust the basin, thus de-

priving them of the water necessary for irrigation and for domestic use.

Temescal Valley extends from Elsinore Lake to the Santa Ana River. Its natural water supply, except in years of extraordinary rainfall, is derived at least in part from local precipitation, drainage from the adjacent mountains and hills, and percolation which feeds into the lower Temescal Valley through the Arlington gap, almost due east of the city of Corona. An additional supply is obtained from return waters placed upon the lands in the lower valley from the imported supply furnished by the Temescal Water Company. Temescal Creek, which forms the drain of the valley, is an intermittent stream, with no surface flow except during and immediately after heavy rains.

To the west of the valley lie the Santa Ana mountains, and to the east the Gavilan hills and La Sierra ridge. Approximately three miles southeast of the center of Corona, the valley narrows to a natural cut in the hills, and at this point there is a geological obstruction in the floor of Temescal Creek, generally referred to as a submerged dam. This not only forms a natural barrier or division between the Upper or Little Temescal Valley and the lower valley, but it also divides the upper underground water basin from the lower basin. Above the submerged dam, the valley at its widest point is approximately two miles wide; the average width is considerably less. Below the submerged dam, the valley widens out and forms what is known as the Corona area. The lands of respondents Otis, Fisher, Kuster and Waterbury, as a copartnership and as individuals, a small portion of the Clark lands, and the lands of appellants overlie that portion of the Corona area called Temescal wash. The greater portion of the Clark lands and the lands served by respondent Orange Heights Water Company are situated in the remainder of the area north and south of Temescal wash.

Respondents claim that the entire Corona area, a triangularly shaped territory of about twenty-five square miles surrounding the city of Corona, contains an underground basin with the water therein everywhere in contact. They assert that all of this area is a portion of the hydrographic basin of Temescal Creek and its tributaries, extending some five miles upstream from the point of confluence of this creek with the Santa Ana River.

The position of the appellants is that the only part of the Corona area which may be properly denominated an underground water basin or reservoir is that called Temescal wash, a strip of approximately 4.7 square miles which follows the course of Temescal Creek. The strip may be roughly pictured as the trough of a valley. The sloping sides of the valley to the north and south are called respectively the Norco mesa and Corona slope and have an area of some twenty-one square miles. This formation, with its trough and sloping sides, comprises the twenty-five square miles designated as the Corona area. If the northerly and southerly slopes join with Temescal wash to constitute one water basin, as respondents contend and as the trial court found, then concededly there is no surplus water in the basin for exportation. But if the extent of the underground reservoir is limited to Temescal wash, as the appellants attempted to prove, then there may or may not be surplus water available for exportation and use outside the basin.

The trial court found, as already stated, that Corona basin exists to the extent and with exterior boundaries as alleged by respondents. Appellants' major contention on appeal is that the evidence does not justify this finding. The trial was a protracted one and the record shows voluminous evidence of a highly conflicting nature. Well qualified witnesses on each side testified concerning the geology of the area, its hydrology, and the relative permeability of soils in Temescal wash, on Norco mesa, and on the Corona slope. Underlying water contours were traced and the discharge of the various wells throughout the area was stated. The record presents thirteen volumes of evidence, more than 6,600 pages, and numerous exhibits.

Appellants argue that respondents failed to sustain the burden of proof and show by a preponderance of the evidence that the entire Corona area constitutes a water basin or underground reservoir, as appellants define that term. They contend that in Norco mesa and Corona slope no substantial amount of water has ever been found and that such as has been found is mere soil water. They also contend that only in that portion of the Corona area denominated Temescal wash can there be found sand and gravel of free permeability or other porous material capable of holding a subterranean supply of water moving slowly through the land

by the process termed percolation; that only in Temescal wash can water be obtained in any quantity sufficient for the development and improvement of overlying lands.

In support of this contention, appellants first refer to evidence describing the geology and hydrology of the area and its underground formation as depicted by various map and model exhibits and as explained by the respective expert witnesses. Much of this evidence is necessarily of a highly technical character. It adverts to the claimed formation of the Corona area as one of several depressed fault blocks caused by the uplifting of the Santa Ana mountain range, to the development of Temescal Creek along the general course of the fault zone, to the history of the Santa Ana River and its tributaries, and to the history and age of respective rock formations and alluvium deposits throughout the territory. Between geologists and hydrologists there are substantial points of agreement and also decided points of material disagreement. This evidence all bears upon the ultimate fact as to whether the entire Corona area constitutes a single underground water basin or reservoir.

Appellants also produced evidence to show that the formations in Norco mesa and Corona slope, of granite and metaphoric rocks, cretaceous rocks and marine sedimentary rocks of the eocene and tertiary age, are practically impervious to water except where fractured or faulted, whereas the formations of Temescal wash are of more recent origin, composed of sands, gravel, and recent alluvium deposits, highly permeable and saturated with water, constituting the only underground reservoir existing in the area. But there is in contradiction of this evidence ample proof which, if believed by the trial court, supports its conclusion that the underground reservoir embraces the entire Corona area.

As already pointed out, the Corona area lies in a "U" formed valley dropping toward the confluence of Temescal Creek with the Santa Ana River. Corona slope and Norco mesa form the sloping sides of this valley; Temescal wash is the trough or drain, and respondents admit that it therefore yields a larger quantity of water than is to be found elsewhere in the valley. They strenuously deny, however, that Temescal wash marks the limits of the underground basin existing in the area, and they refer to abundant evidence supporting their position. There is much to show that the recent al-

luvium and other water-bearing deposits of the Corona area are not confined to Temescal wash but continue throughout the Corona slope and Norco mesa, excluding only the kidneys, lozenges, monadnocks, or islands of impermeable material which are to be found in any basin. In other words, there is evidence that permeable materials exist in the entire Corona area and are all interconnected around and about in various ways to constitute one basin with water in contact throughout. There is evidence that underground water from Corona slope and Norco mesa is in contact with the water in the Temescal wash, and that there is underground seepage and percolation from both slopes in contact with the underflow of the Temescal underground area. It also appears that the entire Corona area, with the exception of the islands referred to, has pores saturated with water, and that to this extent the water is in contact throughout the area.

Appellants contend that the output of wells bored on the Corona slope and Norco mesa demonstrate that those areas are not part of the common underground water basin, and they contrast the large discharge of wells in Temescal wash with the smaller output of wells on the slopes. In fact both parties make exhaustive reference to well logs, water contours, well data, location of wells, classes thereof, output, and observations, and measurements of water elevations in support of their respective contentions. They advance conflicting claims as to the correctness or incorrectness of the water contours as depicted on certain of the exhibits, and they draw different conclusions as a result of their respective reviews of this proof. But within this evidence, which from its nature does not lend itself easily to concise review, there is found ample support for the conclusions of the trial court.

■ Appellants' second contention is that the court erred in finding that there was no surlpus water over and above the amount required to serve reasonable beneficial uses on overlying lands. But in making this contention appellants concede that if the entire twenty-five square mile Corona area constitutes a territory entitled to draw water from the underground basin, then there is no surplus of water over and above that required to serve the paramount rights of overlying landowners. As the evidence supports the trial court's findings concerning the extent and boundaries of the basin, this second contention has no merit.

█ Lastly appellants urge that the trial court erred in failing to determine the extent and character of the correlative rights of the parties; that is, that the trial court should have adjudicated, as between the overlying owners, the amount of water to which each was entitled before undertaking to decree whether there remained in the basin any surplus water which might be subjected to appropriation and exportation by appellants. In this connection, appellants rely largely on the recent case of *Tulare Irr. District* v. *Lindsay-Strathmore Irr. Dist.*, 3 Cal. (2d) 489 [45 Pac. (2d) 972].

The Lindsay-Strathmore case was an action by appropriators, riparian owners, and overlying landowners to quiet their title to the surface and underground waters of the Kaweah delta as against the defendant irrigation district and to enjoin the district from pumping water and transporting it out of the Kaweah watershed. The trial court found that defendant's exportation activities were injuring plaintiffs and gave judgment perpetually enjoining the irrigation district from pumping or transporting water for use without the delta. It did not decree, as between the parties plaintiff, the amount of water to which each was entitled.

Upon appeal this court modified the judgment and ordered a new trial as to particular issues. The opinion points out that so far as plaintiff riparian owners were concerned, the trial court predicated its findings upon the doctrine (which was the law at the time the judgment was entered), that a riparian owner, as against an appropriator whose right had not ripened into a right by prescription, was entitled to the full flow of the stream without diminution by the appropriator. However, after the trial of the case, article XIV, section 3, of the Constitution (the amendment added in 1928) became effective and applicable to the case. This amendment made the rights to water as between riparian or overlying owners and appropriators dependent upon the amount which each was putting or could put to a reasonable beneficial use. This court held that under the constitutional mandate it became necessary to determine whether the riparian and overlying owners in the particular field, considering the needs of all, were putting the waters to reasonable beneficial use and whether, after a consideration of such use, there was a *surplus* in the water field subject to appropriation by defendant.

The logic of the holding is obvious. As the rights of the riparian and overlying landowners were limited to the amount of their actual or prospective reasonable beneficial use of the water, and the rights of the appropriators were limited by their respective appropriations, the amount to which each was entitled had to be adjudicated before it could be determined whether there was a surplus in the field subject to appropriation. But in the present case the evidence shows there was no surplus. Also, the trial court made complete findings as to the very elements lacking in the Lindsay-Strathmore case. In the present case the court found the *overlying owners* were putting *all* water in the field to *reasonable beneficial use,* and that it was necessary to augment the supply by importation of outside water in order to supply their requirements for reasonable and beneficial use. This finding conclusively shows there is no surplus for exportation, and it was unnecessary to determine the amount of water to which each of the respondents is entitled. Such a determination would not be decisive in the present case as all of the water users whose lands overlie the Corona basin are not parties to the judgment.

Appellants argue that every action involving water rights is an action to quiet title wherein the exact amount of water to which each party is entitled must be decreed. Actions involving water rights are often, in effect, actions to quiet title, as said in the Lindsay-Strathmore case. But this general language does not cover all cases, and there may properly be an action such as the present one to enjoin the withdrawal and exportation of water where the quieting of title is not involved. (*Strong* v. *Baldwin,* 154 Cal. 150 [97 Pac. 178, 129 Am. St. Rep. 149] ; *Omnes* v. *Crawford,* 202 Cal. 766 [262 Pac. 722].)

The prayer of respondents' complaint must be read in the light of its allegations. When so read it is immaterial that the prayer contains a request that the "court determine and adjudge the respective rights of the plaintiffs and defendants herein, in and to the underground waters of Corona basin", for the body of the pleading has no averments which call for an adjudication of the respective rights of overlying owners as between themselves. The gist of the charge is that the entire Corona area constitutes an underground reservoir and that there is therein no surplus water subject to appropriation. This was also the theory upon which the case was

tried. No record was made by either side which would serve as a basis for adjudicating the amounts used by the respective overlying owners. Neither was this necessary in view of the concession that if the larger area constitutes the basin, then there is no surplus water not already being put to a reasonable beneficial use on overlying lands.

The judgment is affirmed.

Shenk, J., Curtis, J., Langdon, J., Waste, C. J., Seawell, J., and Thompson, J., concurred.

Rehearing denied.